Good morning. The first case on the call of the docket this morning is Agenda No. 6, No. 1, 2, 5, 3, 8, 6. David W. Cooke v. The Illinois State Board of Elections et al., Intervenor Appellants, Committee for Frank Maturno Appellant. Mr. Vaught. Good morning. May it please the Court, Madam Chief Justice, I'm Adam Vaught. I represent the Committee for Frank Maturno. The issue on appeal is whether or not the committee violated Section 9-810A2 and 8-9 of the Illinois Election Code. The State Board of Elections determined by a 4-4 vote that the committee did not violate. On appeal, the Fourth District reversed and found that the committee did violate the Election Code by, one, interpreting the Election Code very narrowly in a way that will be very difficult for committees to follow if the analysis is adopted by this Court, and, second, by substituting its own factual determination for that of the State Board's, and that was contrary to the clearly erroneous standard of review. I want to talk about the statutory interpretation and the standard of review, but first I think the nature of this case is unique, and I'd like to discuss the facts. Frank Maturno was a State Representative for 28 years prior to being elected by the General Assembly as Auditor General in 2015. During his 24 years as a State Representative, he represented an area in north central Illinois that was anchored by Ottawa, LaSalle, Peru. It's a large district. It's rural. A lot of miles are put on cars, both traveling to and from events, but also doing campaign work, working in various towns. During that time, the committee had an account at Happy Service Station, which was in Spring Valley, and they had a charge account, which is somebody could come and say, you know, I need to get gas in the car. They would put it in the car, and then the committee would be charged at the end of the month. Mr. Maturno also had a personal account there for his own personal travel, which was separate from the committee's account. Also, the committee had an account at Spring Valley City Bank, and what the committee would do is if Mr. Maturno was going to travel to, say, Chicago for a political trip or a governmental trip, he would go to the bank, would write a check to the committee for cash, $200, for example. He would take the cash and go to Chicago. For 17 years, these expenditures were all reported. They're on the State Board of Elections website, available to the public. The committee dissolved in December 31, 2015. In fact, they represent an entity that does not exist. Mr. Blatt, does it make a difference that the committee was dissolved before the complaint was filed? Your Honor, I think it does, because especially with what happens with the record-keeping that follows, following the committees being dissolved, the committee treasurer asked the State Board of Elections, what do we do with all these records? They had 24 years of records. The treasurer testified in her deposition that what would happen is for each month they would have a folder, and receipts would be put in that folder, check stubs, anything, any records that they needed to keep under the record-keeping requirement of the State Board of Elections, the state of the election code. The State Board said that you can get rid of the receipt, you can get rid of everything, you've just got to keep the last two years. And what the treasurer interpreted that was is that she needed to retain anything that was reported in the D-2 that had been filed. So what you would have is you would have the checks from the bank, you would have the invoice, the monthly invoice from Happys, but you wouldn't have the specifics of who got gas on what day or what cup of coffee or dinner was paid for with the cash. So the committee got rid of these records. And then about a month later after this happened, an article came out in the Agger County Watchdogs, which accused the committee of having improperly spent funds at Happys and Spring Valley Bank for years. May I just follow up on this back question? Is the communication between the committee and the board as to the proper retention or destruction of the records, is that in the record? I believe it's in Ms. Manu's deposition that she did discuss it with the state board. There's not like the specificity of which questions were asked or anything related to whether certain questions were asked about a specific receipt. But it is in the record that she did reach out to the state board and ask them. The state board certainly said you only have to retain records for two years. So of at least 22 years, there's nothing. And for the two years, there was some stuff, but just not all these specific details. The board did find record-keeping violations, though, correct? And fined the committee $5,000, I believe? Absolutely, yes, correct. That's not before us, correct? That is not before you. That is not before you. So the board entered an order. The article triggered the interest of the U.S. Attorney's Office. And as part of this, the committee asked first to dismiss for lack of jurisdiction because the committee had been dissolved. That was denied by the board. The committee then twice asked the board to stay proceedings until the investigation was complete. That, too, was denied, which put the board in the position of, one, Mr. Martinez stated that if he was called to testify, he would have to invoke his Fifth Amendment rights. But then also the committee itself, because they didn't know what records may be of interest, didn't want to supplement something that may be proved problematic. And also just the problem with the fact that the committee no longer existed, so there was no treasurer or chairman who could actually submit an amended report. But because of that, the State Board had ordered the committee to amend the report. They had a hearing, and the recommendation of the hearing officer was because the report was not amended, to hold it in violation. And the board did adopt that holding and found that the board was in violation for failure to update the records and, therefore, under the record-keeping provision, they found the records improper. So they fined the committee the maximum of $5,000. So the committee's records, the record-keeping problem, that's not before the court. That has been decided by the State Board. That has not been appealed. But what happened out of that is when the board decided to fine the committee for record-keeping, Mr. Cook, his attorney, argued that the committee should then hear whether or not there was A2 or A9 violations. The board denied that and went up to appeal to the 4th District. The 4th District reversed and remanded back with instructions to hold the hearing on whether or not A2 and A9 were violated. The board then held a hearing. It introduced and accepted no new evidence. Councils for both sides made their arguments for why A2 and A9 were or were not violated. And the board split 4-4, finding no violation. Because under the election code, you have to have five votes in order to have a finding. This then goes on to appeal to the 4th District. Now, the 4th District first interpreted A9, I think, very narrowly. And, in fact, it's going to make life very difficult for committees throughout the state. So Section A9 deals with whether or not election committees can purchase automobiles. It says initially that you cannot purchase an automobile unless you can prove that it would be cheaper than it would be to lease, which makes sense because, you know, in every election, theoretically half the committees are going to end. And if you've bought a car, what do you do with the car? Well, if you need to have a car, it's better to lease or prove it's cheaper. The next sentence is that if you purchase or lease a car, it has to be primarily for governmental or political purposes. It says if you do that, then you're able to maintain, insure, or repair the vehicle. The 4th District takes that language of maintain, insure, and repair to say the legislature is saying you may only maintain, insure, or repair a vehicle that the committee bought. But it isn't – it shouldn't be read so narrowly because if you read it in context, it's just referring to the car that the committee is allowed to purchase if it fits that narrow exception that is primarily for political or governmental travel. Okay. So do I understand now, if you're talking about some volunteer for the committee, for the committee, they can pay for the – in addition to the mileage, they can pay for repairs and all that sort of thing on the car under that provision? Well, it would depend. I mean, the facts would certainly matter. So in this instance, in this case, the committee paid for repairs to Mr. Martino's vehicles. There was no repairs made to any volunteer's vehicle. The volunteers only got gasoline. There was – nobody got a repair for their own vehicle. But as we read the code, the next sentence after that they may insure says that the committee may reimburse non-committee vehicles with mileage, but it doesn't make that that's the exclusive way of paying somebody for reimbursement of gasoline expenses, for example. The Fourth District says that Section A-9 is the exclusive provision for reimbursement of vehicle expenses. However, that ignores Section A-6, which says that a committee cannot reimburse for travel expenses unless it's for political or governmental purposes. So under A-6, it's okay to reimburse for travel expenses if they're for political, which would include gasoline. So, you know, if you went to the gas station and you put $10 in your tank and then you gave the committee the receipt for the $10, there should be no problem with that. But the Fourth District has read A-9 so narrowly that if it involves a vehicle, then you either have two options. The committee buys the vehicle, in which case you can give it gas and repairs, or you have to pay mileage. A-9 is the only section that specifically talks about vehicles, though, correct? Because the section you just referenced talks about travel expenses in general. Subsection C just talks about expenses in general. But that's the only one that specifically talks about vehicles, correct? That is correct. It is the only one that specifically mentions vehicles. So why wouldn't that be, again, specific versus general when we follow the specific section? Right. Well, I think you need to look at that subsection in context with the rest of 9-810. So 9-810, it is prohibiting certain sort of expenditures but then also allowing exceptions. So, for instance, it doesn't allow a committee to buy people clothing. So it couldn't buy Frank Montino a new coat and new shoes to go walking door to door, but it could certainly buy T-shirts with the committee logo to wear in parades. It says that you're not allowed to pay for tuition expenses, but you can pay for expenses if they're for a political or governmental purpose. So while the committee couldn't pay for Mr. Montino's kids' high school or college tuition, they could pay for him to go to a conference at the National Center of State Legislators, for example. So there is all these exceptions, but they're concerned with certain expenses. Like A-3 says you can't pay somebody's personal debts. So you can't pay a candidate's credit card, but the committee itself can have a credit card if it's paying expenses. So when you read A-9, it's kind of talking about can you buy or lease a car. And the general rule would be no, you can't, but there is an exception that if it's going to be used primarily for political or governmental purposes, then you may purchase or lease a car. And if you do that, you're okay to insure it, to maintain it, to repair it. But when it's talking about a vehicle, it's not talking about all vehicles in the world. It's just what do we do with this issue if the committee itself purchases or leases the vehicle. Counsel, will you talk to us about deference and how much deference we should give to the board, particularly in light of the fact they split evenly? Your Honor, the standard review is clearly erroneous, but I think in context of the State Board of Elections and especially what it is that they deal with, I think that deference is a hugely important issue. The State Board of Elections is designed to be split evenly among the two major parties to make these sort of decisions. And in order to get a finding, you have to have five members. So that means there needs to be at least one person crossing over on parties to make a finding that there has been a violation. So in this case, it was split 4-4. But the argument that was raised by Mr. Cook was, you know, he had the burden of proof, that he had the burden of proof that there was a violation. And his argument wasn't, look here at September 24th of 2015, this expense was for personal use. His argument was, well, in the totality of these years we're looking at and all the money was spent, inevitably there must have been some expenditure that was for personal use. But there was no specific evidence of that. So the four board members who voted that there was no violation said, we don't know what happened. We've already fined them for the recordkeeping. But without those records, without testimony, we don't know. I think one of the members called it an amorphous blob. You know, there was pure speculation. And so, I mean, if it was a civil jury trial, you're allowed to decide whether or not circumstantial evidence is persuasive or not. But a court of review wouldn't overturn a jury's verdict if they rejected a circumstantial evidence argument. Likewise here, if the board found 4-4 that there was no violation, the court should have deferred to it and affirmed. If the board had found 5-3 that there was a violation, then the court should have deferred to the board and affirmed. Either way, the board should be left to decide that. And it's important, too, is that while we're talking about clearly erroneous and that this is the agency review, standard review, the State Board of Elections does stand unique under the Illinois Constitution. There are only two agencies that are created by the Constitution, the State Board of Elections being one and the State Board of Education being the other. State Board of Education is given certain powers, but they can be removed by law. But under Article III, Section 5, the Constitution says that the State Board is giving general supervision of the administration of election laws in the state. And, in fact, the only other place where the Constitution uses the word supervision is the word supervisory when it talks about this court's supervisory authority over the Illinois courts. So the Constitution was set up so that no party can have a majority, and it's giving general administrative authority. So when we're talking about deference, I mean, the people who are on the board are appointed because of their experience with elections and election laws. And when we're talking about factual instances of what happened in a campaign and what a committee did, that factual determination should be in great deference unless there's just a clear error. And here there is no clear error. There's an absence of evidence. And the Fourth District, instead of just deferring to the determination, decided that it thought the better determination was that because there's all this spending and we don't know what it was, something must have been converted to personal use. That holding is just improper. It should have been deferred whether the court agreed with it or not. Counsel, whose fault was it that there was a lack of evidence? Well, it's kind of all over the place, really. I mean, the committee no longer existed. I mean, this isn't a committee that is in existence. They said, well, we need to see your records, and they said, we don't have them. This was a committee that had been dissolved. They maintained what they thought were two years of records, but we're talking about 1999 to 2016. So, you know, even under the Act's record-keeping requirements, they were not required to maintain the records for more than two years. And then there was the issue that the committee asked the board to stay so that later on perhaps Mr. Martino could provide testimony or, you know, records could be found that could supplement the report, but the board refused to grant that stay and then put him in the position of, you know, either come and sit for a deposition or book your Fifth Amendment rights. And so, I mean, any attorney would, under that circumstance, would advise, you know, as Mr. Martino, as he decided. So I don't know that there is fault. I mean, I certainly understand the question of, well, how do we figure out what happens here? But that goes to the record-keeping. You know, the records weren't there. The board fined them the maximum. That resolves the issue. So whether or not there are other violations, if the question is, well, we don't know what happened, well, there's no evidence by Mr. Cook, who has the burden of persuasion, to say that here is evidence that there was a conversion of personal use. We would like to have the records. It would have been better if we had the records. It would have been a lot easier to say there's nothing here, but the circumstances as they arose led to the fact that those records aren't there. That doesn't mean that there was a violation of A9 or A2, but there was a violation of the record-keeping provision, which is why the board fined them, and that's why that was not appealed. So we understand that. If A9 is read to proscribe car repairs for personal vehicles, a violation is proven. I mean, I realize you're arguing that A9 shouldn't be read that way, but if A9 is read that way, the way the 4th District did, then they did prove a violation, correct? If A9 is read the way that you just described in the 4th District, then yes, I would concede if it's limited to personal vehicles are not allowed to have repairs made to it, then yes, it is. But I also think that that's why it's a poor reading of A9. And I'll give an example. It's in a reply brief. If you have a volunteer who's willing to deliver signs, and you have a big district like Mr. Martino's, they take out for the day and they get 10 miles down the road and blow a tire, well, under the 4th District's analysis, the committee can give them $5.60 maximum because the IRS reimbursement right now is $0.56. Then again, in that same scenario, if the transmission fails on that vehicle, then can the committee rebuild the transmission? Well, it depends. So, I mean, that's where it gets into the A2 analysis, is the A2 analysis the 4th District read in this purpose requirement. And it said that, you know, they use it in the context of gasoline, but, you know, if you put in 10 gallons of gas but you only use eight, those other two you got no value for, and so the fair market value was zero. I think that's not the right way to read it. You need to look at what the purpose behind the committee's expenses. So in the tire example, if the volunteer can't afford to fix the tire and the committee needs that person and that car out on the road, the committee ought to be able to repair the tire so that the person can get out. You know, the fact that later on the committee, you know, the person may have a benefit because now they've got a new tire or a fixed tire they wouldn't have otherwise had, that doesn't make it a violation because for the committee's purpose, they needed that person on the road, and that was the cost of getting that done. Because, you know, the board, the Act refers to, it defines an expenditure as anything made in connection with an election. If you're fixing the tire or you're fixing the transmission, if it is in connection with the election, then it would be permissible under the Act. But then again, that also goes to why we have the State Board of Elections because they got to decide whether or not they accept that idea that you needed the transmission fixed or that the car being fixed was okay. And then they make that factual determination, and whenever that is, unless there's some obvious clear error, the court should affirm it. And, you know, that's where the code, the code shouldn't be read so that it's, you know, it only allows what it says. It should be read as it only prohibits what it prohibits. And if it doesn't specifically prohibit something, thank you. Thank you, Mr. Clark. Mr. Schwab? Just a moment. Thank you. Thank you, Your Honor. May it please the Court, my name is Jeffrey Schwab. I represent David W. Cook, the appellee in this matter, and my law firm is the Liberty Justice Center. This case boils down to three issues that are based on two factual circumstances and two statutory provisions of law. And under the Fourth District's decision, it found three things. First, that the committee violated Section A9. I'm calling it Section A9. We all know the full title has got, like, decimal points. But I think we all know what we're talking about. By making expenditures for gas and repairs at Happy's Super Service Station for vehicles that the committee did not own or lease. Second, the Fourth District found that the committee violated Section A2 for making expenditures for gas and repairs for personal vehicles at Happy's in excess of the fair market value of what the committee received in return. And the reason that what they received in return was the use of the gas, filling the gas for the campaign or governmental purposes. But inevitably, the way that they filled up the tanks automatically meant that they were using that gasoline for personal purposes, too. So the fair market value is what the committee received for the campaign purposes while which would be inevitably less than what it actually paid. And then finally, that the committee violated Section A2 by making expenditures in excess of what it received in return when it withdrew funds from Spring Valley City Bank in whole dollar amounts and inevitably did not incur expenses of that amount to third parties equal to what it withdrew. And we have testimony from the treasurer that when Mr. Martino withdrew that amount of money, he never returned with any excess change. So if he withdrew $200 for travel expenses to Chicago, he came back, he didn't return $8 and say, I spent $98. I took out $200, but I only spent $98. I couldn't have known, but I'm returning it, and then we're going to report it as $192 or whatever it was instead of $200. So those are the three things that the Fourth District found. And this Court should affirm the Fourth District's finding because it's based on the evidence and the facts, which are all agreed. There's no dispute of facts in this case. The facts are from, and contrary to Mr. Vaught's position, we have tons of evidence in this case. We have happy super service station documents about this thick of all of the services that it provided. We have testimony from the treasurer. There's only two members of the committee, the treasurer and Mr. Martino. We have testimony from the treasurer that says exactly what the committee was doing. And that's exactly what the Court relied on. And there's no dispute from the committee that that's not true. So I'd like to ---- Kagan. In terms of the facts, in terms of deference, that's the issue I'm following through on here. Sure. You say there are many ---- in the record there are facts to support the appellate court's decision. At the board level, wasn't it true that two of the members who voted to find a violation relied on a negative inference because the gentleman had invoked his Fifth Amendment right? In other words, it appears they're saying there was not enough. Even the people, two of the people who voted to find a violation, did not rely on the facts before, but relied on negative inference. Is that correct? I don't think that's entirely correct. I think what they were saying was that they relied on the evidence presented and, in addition to the evidence presented, took a negative inference into Mr. Martino's refusal to testify. And is that explained in the record somewhere? It probably is. I don't know exactly where that would be. It might be in our facts section. I know that it might be in the Fourth District's opinion. And there was, I think there were, in the record there were transcripts, I think, of the board's meetings, so probably in that transcript somewhere. And on the same idea, in the appellant decision, did they rely on specific facts or, again, an inference that probably that there was misuse of funds here? Did they point to specific facts? They did point to specific facts. And because there's two sets of facts, I can explain both of them. For example, in the first set of facts, what we have is we have spending at Happy Super Service Station. We have testimony from the treasurer that what happened was they had a charge account. Mr. Vaught actually explained this pretty well, that they had a charge account. They would fill up the gas tanks for their volunteers or employees or whomever for when, after they used their personal vehicles for campaign use. So, obviously, the inference that we can draw from that, since it's inevitable that you're going to spend, if I drive 10 miles for my campaign, and then you fill up my tank, unless my tank was completely full at the beginning of my drive, then you're going to pay for gasoline that's going to be used, inevitably, for personal purposes. So the appellate court relied, again, on inference, rather than the facts? On facts, based on facts. Pardon? Inference is based on facts. The clear inference from having paid for gasoline from people who went and used their cars for campaign or government purposes is, inevitably, there's no way that you can always make sure that every ounce of gasoline is used only for campaign purposes. And this is a period of a long time, 15 years. Inevitably, it's going to result in some use of personal purposes. So it was an inference, but it's an inference based on facts. And, of course, the burden of proof is on the plaintiff, but the burden of proof is only a preponderance of evidence in this case. And that's, of course, enough to meet that burden, I think. It sounds like speculation, though. Well, I don't think it's speculation, because speculation would be that it could have. In this case, it's inevitable that the... Well, it's the same as could have, isn't it? No. Inevitable means that it did happen. We just might not be able to prove it. And how could we prove that the campaign workers used their vehicles for personal use unless we were tracking them? That would be un-American, I think. But, like, we can infer that they did, because if I'm a campaign worker, and say I work for the committee twice a week, and I drive 20 miles, and then the campaign fills my gas tank up, and then I drive home. Driving home, I've already used... You know, and say I stop on the way to, you know, visit a friend, and then I go somewhere else. I've already used the car. I've already used that gas for personal purposes. Well, it's speculative, because you don't know... When a person leaves his house, gas is used.  And he has to get back to his house with the car. It would have to be, in order for that to be correct, it would have to be every single person that filled up gas, that Frank Macchino filled up gas for, only drove to and from and for campaign purposes every single time he filled up gas. That's impossible. How is it impossible? I will be frank. Mike, I think the issue comes back to the lack of records. I mean, the way you could show that or disprove it would be records. But that seemed to be where the board was stuck. The board, including two members who voted to find a violation, couldn't find evidence here because there were no records. And so two members of the board had to rely on a negative inference because of the invocation of the Fifth Amendment. Okay. Let me step back one second and talk about the two laws that we're talking about, because I think that might also shed some light on this. So the first is A-9 that we're talking about. And the question is whether A-9 prohibits a campaign committee from spending money for gas and repairs for personal vehicles that might be used for campaign or governmental purposes. There, there's no issue. There's no issue of inference because we know from the testimony that they did do that. So the only question is whether the law does prohibit that. And so in that case, I don't, for A-9, I don't think there's any issue that the evidence is present. And Mr. Vaught even testified or mentioned that if the A-9 were interpreted that way, then his client, of course, would have violated it. So there's no question for A-9. So what we're talking about is A-2. And the question in A-2, A-2 provides whether the committee paid fair market value for goods or materials or services received in return. And so the question there becomes, well, did they, so the question is whether they spent, whether they paid money for services or for gas that was used for campaign purposes only, or, and then in the other facts, whether they spent, whether he spent money for travel expenses that was used for travel expenses for campaign purposes only, not used for personal purposes. So there is, I think, the area where you're talking about inference. But in the second instance where you have Mr. Martino withdrawing cash in $200, say, so it's $200, I think there are 13 times, I don't remember if every single time they were in $100 amounts, but I think there are several instances where there are $100 amounts. And I think in every instance they were in whole dollar amounts. So he would withdraw this money, he would go on his trip, presumably spend some of the money, if not all of the money, on the travel expenses. But the question is how could he, could he have, is it plausible that 13 times that he spent exactly whole dollar amounts because we have testimony from the treasurer that sometimes he would provide receipts, but not always, and he would never come back with cash. So the question is, is it plausible that 13 times that Mr. Martino would have spent whole dollar amounts? And that's just not plausible. I'll tell you for this. Why wouldn't it be? Maybe he spent his own money if it was over the amount. If he did that, then he would have violated the code in another way because he would have made a contribution to the campaign without disclosing it. I have the testimony, the testimony of the treasurer, and I think the inference is clear. I mean, I've been to this, I've been to Springfield at least four times for this case alone. Not one time have I spent exactly a whole dollar amount in expenses traveling here. It's just implausible. And we're talking about 13 times. And every single time he spent a whole dollar amount. It's not a whole hundred dollar amount. So maybe back to standards. You're saying probable, how could it be, what are the standards here? We have the burden is on the objector here, Mr. Cook, correct? Correct. And in terms of the standard of review in the appellate court of the decision of the board, what is the standard of review there? More probable or not? It's preponderance of the evidence. This is a civil trial. Preponderance of the evidence is the standard. So what's the standard of review? The standard of review is, well, because there's no factual issues, the standard of review is clear error. So under a preponderance of evidence standard, it's reasonable to take the facts that were provided, rely on those facts, and make reasonable inferences that it's just very, very, very unlikely, if not impossible, that in the situation where gas and repairs were being done, that those gas and repairs were only being done for campaign purposes. That's probably the problem. It's the appellate court here. In your argument today, you've used the word inevitable many times. In the appellate court here, the standard they appeared to use, which I've never seen really in other cases, an inevitability standard. And on the spectrum between reasonable inferences and pure speculation, you know, the inevitability standard appears, at least at first glance, to be somewhere in between there, whether it's closer to one or the other. But the question is, if you stray even a little bit from the reasonable inferences, have you sustained your verdict? I don't think we're straying at all. I mean, I think these are very, very reasonable inferences. I mean, you would put a lot, if you were betting, you would put money on these being unlikely, I think. Right? I mean, if somebody said to you, like, you know, like $10,000 to one, whether they actually used an ounce of gasoline for personal purposes, it's inevitable. You would take it. It's so clear that they had to, because they couldn't have filled up only, every single time, only for campaign purposes. There's no way to track it. And that's just not what humans do. We don't just fill up and then say, oh, I'm only going to use this car for campaign purposes if it's my personal vehicle. Because we're talking about personal vehicles. We're not talking about campaign vehicles. Right? We're talking about personal vehicles. But the appellate court said that its reading of the Section 9-8 was necessary because an expenditure for improper purpose would otherwise go unpenalized. But I really don't understand that, because Section 9-8 sets out a list of many things that a political committee cannot spend money on. If a complainant can show that a committee violated one of these prohibitions, then the committee can be punished. So you have to show how he violated, not on speculation. How did he violate it? Just because he got X amount of dollars and didn't have a receipt? No. Well, the question is, under A-2, whether he provided fair market value for what the committee received in return. So what the Fourth District interpreted that to mean is that you have to both look at the words fair market value, right, and then what they received in return. So a perfect example of this is let's say that the committee spends or pays for 100 gallons of gasoline, but it only receives 50 gallons of gasoline. Well, then obviously it's paid more than fair market value, right, because it's only received 50 gallons of gasoline. It's paid the fair market value for 100 gallons of gasoline. Similarly, in this case, what we're saying is by filling up the way that they did, by taking personal ---- But isn't that just poor recordkeeping? And they've already been penalized for poor recordkeeping. Well, they haven't been penalized for poor recordkeeping at Happy's. They were penalized for poor recordkeeping at the bank. And the reason that they were penalized for poor recordkeeping at the bank was because the way that they recorded expenditures was they would say we spent $200 for travel expenses, and then they would say provided by the bank. Well, of course the bank didn't provide the travel expenses. The bank was just the vehicle by which they had their credit account or their bank account. And so what they were doing is they were actually withdrawing money from the bank, and then they're spending it for third parties. So the problem was they weren't reporting to the third parties where they were actually spending the money. So that's why they were penalized. So the question here is totally different. And, of course, different in the Happy's context, because we ---- that's not what they were penalized for. And they weren't. And they couldn't be penalized. In theory, they should be. Why can't they be penalized, you said? Well, they ---- what they should be penalized for is violating two provisions, A9 and A2, because they were spending gasoline in a way that the code does not provide. And for good reason. The Fourth District gave two reasons why you would want to record gasoline by the mileage. And one is if you're paying Happy's like they did, then you're not telling us who actually received the gasoline. So we don't know. See, my time is up. I don't know if you'd like me to finish my point, but it's also in the briefs, so I can ---- I'm happy to stand on the briefs. Any other questions? All right. Thank you. Thank you, Your Honor. Thank you, Your Honor. Mr. Block. Thank you, Chief Justice. I think Mr. Schwab's argument gets to the real problem with the case. And he's talking about the inevitability and he's talking about what must have happened. There's no fact that is pointed to to demonstrate clearly what it is he's arguing happened. And so that determination of whether or not it's inevitable or not, that was for the State Board of Elections to make. And they made their determination that there was no violation of the code. So on review by the appellate court, unless that was clearly wrong, it should have been affirmed. And the court did not do that. It actually applied a preponderance of the evidence to any setting. It's probably more true than not that money was used for political ---- for personal purposes. And actually I disagree that even the facts as demonstrated show that. If we first talk about the money taken from the bank, for example, if the check is written for $200 and they take the cash, you know, Mr. Martino used the cash for a trip to Chicago, Mr. Schwab said how is it that it's possible that it was always exactly $200? Nobody's saying it was always exactly $200. If Mr. Martino had come home with $30 left in his pocket, there's no requirement that he has to go back to the bank and deposit it because he could later on use that cash for another political or governmental purpose. For example, if the next day he had to go to Springfield and he used that $30 to take somebody for lunch, that's permissible. The issue is a matter of record keeping. They needed receipts to demonstrate what the money was used for. But it doesn't have to go back to the bank. Likewise, if he went to Chicago and spent $200 and then ended up spending $250 and the $50 came out of his own personal pocket, there's no obligation under the code to report that. A political candidate or officeholder can spend their money as they see fit. The committee can offset certain expenses. They can reimburse them for certain expenses. But it's not a contribution for the committee if Mr. Martino spends $50 taking somebody to dinner, even if it's for a political purpose. So either if he came back with money in his pocket or he ended up spending extra money, there isn't a violation under what I'm saying, you know, under the examples I'm stating. And there is no evidence to suggest otherwise. Now, again, for the issue with the gasoline, if you put 10 gallons of gasoline in somebody's car, as the Chief Justice suggested, you may not, you know, they've got to go home, they've got to get back. You know, exactly how many miles are they going to drive, that's unknown. But the Fourth District reads this purpose requirement into A2 to essentially say you can't have any leftovers. If you give somebody 10 gallons of gas and they only end up using nine, that becomes a violation. And if this court were to adopt that interpretation, the committees are going to be really, really, have a really difficult time trying to follow the election code. For instance, if you have a fundraiser and you hope for 100 people and buy food and only 50 people show up, you have leftover food, if volunteers take that home under the Fourth District's analysis, that is now a violation. You know, mention or reply brief, leftover pizza could become a violation. And it does sound absurd, but this is a political issue. And so, you know, things become very trivial if you can say that the other side violated the law. On the gasoline issue, are you saying that the committee has the option of buying somebody 20 gallons of gas or giving them a mileage reimbursement, or can they get both? One or the other. I don't believe you should be giving mileage reimbursement and paying for gas. But the committee, you know, under the code, should have the option to buy gas, because paying somebody for the gas is cheaper than giving them mileage. So, for example, if somebody travels 100 miles and you give them the 56 cents a gallon mileage reimbursement, they just got a $56 check, but if you fill up 10 gallons of gas at $3 a gallon, it costs the committee $30. So the person may end up with extra gas, but the committee also spent $26 less. Like, that's kind of the odd thing about the Fourth District's interpretation of 8-9. They said if the committee had bought Mr. Martino a car or leased him a car, then there wouldn't have been a violation. Yet that requires the committee to spend more money. So the violation is, is that Mr. Martino saved the committee money by using his own car. Likewise, they say because they didn't buy him a car, they should have given him mileage reimbursement. If they had paid 50 cents or whatever the IRS reimbursement rate over those years to Mr. Martino was, the committee would have spent far in excess of what it did spending it to Happys. So, you know, the code is trying to prohibit people from spending money, so they go to personal purposes. Yet the Fourth District's interpretation causes the committee to have to spend more money. And not only that, that interpretation will now suggest to committees that the best course of action is to purchase or lease a car, but at the same time the code is trying to say we'd really rather you not purchase or lease a car. But if you do, it can be under these narrow circumstances, and, you know, this is how you follow it. So reading A-9 as the court did, it sort of turns the incentive to buy a car when there's a disincentive written into the code from buying a car. So by A-2 saying you have to have this purpose, it sort of gets this leftover problem that now committees, if they don't perfectly predict what it is they're going to spend and then use, then you have violations. As Mr. Schwab said, well, how did he know that he was going to need exactly 100 bucks to go to Chicago? Well, he didn't. And, you know, there's nobody suggesting that anybody knows exactly how much a trip is going to cost. You don't know where, you know, you may know where you're going to dinner, but you may not know what you're going to purchase for dinner. And if you're buying somebody else dinner, you certainly don't know what they're going to order. So there's no way to predict exactly how much an expense is going to cost in the beginning. Keep in mind, too, the election code was written before everybody had credit cards that were really easy to use. I mean, it was written at a time when, you know, cash was ubiquitous. And so people would take cash and then spend it. And that's where the reporting requirements come in. That's where we get back to the factual problem in this case, is that there isn't the records to demonstrate what that money was spent on. And that's why the committee was already fined for that. But there was no evidence that should lead the appellate court to find. It was clearly erroneous for the board to find that there was no evidence that anything was spent for personal use. Unless there's any more questions, I would yield the remainder of my time. We just ask that the court reverse the fourth district and affirm the state board. Thank you. Thank you. Case number six, or agenda number six, number 125386, David Cook v. Illinois State Board of Education, will be taken under advisement as agenda number six. Thank you, Mr. Vaught and Mr. Schwab, for your arguments this morning.